Robinson agt. Norris.

# SUPREME COURT.

## EUGENE N. ROBINSON *et al.* agt. JOHN NORRIS.

*Validity of contract with stock brokers.*

A customer who deals with stock brokers is estopped from disputing the high rates of commissions charged against him for raising money to carry his stocks in a stringent money market, where he is informed of their custom in that respect at the beginning of their dealings, and is kept informed at short intervals of the daily state of his accounts with them, to which he makes no objection until called upon to pay up.

Neither is the customary objection tenable, that the brokers acted as his agents in borrowing the money, and, therefore, he owed the principals who loaned the money and not the agents; because no rule is better settled than that if an agent pays out money for his principal he may sue and recover the sum so paid from the principal.

Although the court of appeals has decided that no custom among brokers can deprive parties of rights which the law gives them, they have not decided that those rights may not be waived by agreement.

Therefore, where the customer, at the commencement of his dealings with the firm of brokers, deposits with them money with an order to purchase stocks, &c., on his account, and receives from them an agreement for his signature saying, " we herewith inclose our usual customer's agreement for your signature," and he signs and returns the same to them, which agreement authorizes the brokers to sell at their discretion, at the brokers' board or elsewhere, or at public or private sale, with or without advertising, and without prior demand of any kind upon or notice to the customer of the time and place of sale, all or any gold, stocks, property, things in action or collateral securities held by them and belonging to the customer, the latter is bound by the terms of the agreement — and would have been bound though he had never signed it or given any assent to it , if he subsequently gave orders under it.

Where the customer never, by any act of his, showed that he intended to close his accounts with the firm, there never having been any formal closing of it, although it might have been balanced for a few days, he is not authorized to claim that the dealings were confined to one specific purchase of bonds, which account was balanced, but the bonds were

never delivered up to him by his order or request, but retained by the firm as security for any future margin, and were eventually sold by them to satisfy it.

*Special Term, February,* 1874.

THE plaintiffs in this action are bankers and brokers in New York and the defendant is a lawyer in Buffalo.

In the month of October, 1872, the defendant opened an account with the plaintiffs and remitted to them the sum of $1,000, and also giving them an order by telegram to buy certain stocks. In a letter of the 10th of October, 1872, acknowledging the receipt of this telegram, the plaintiffs say to the defendant, "we presume Messrs. H. U. Burt & Co. have informed you as to our custom in case of stringent money markets. After using our capital deposits and such loans as we obtain from banks and trust companies for the benefit of our customers, without extra charge, we charge to them, in proportion to their debit balances, such expenses as we may have to incur by reason of the stringency."

On the 18th of October, 1872, the plaintiffs bought, for the account of the defendant, $5,000 South Carolina bonds, and on the same day informed him of the purchase by letter, which contained the following clause: "We inclose herewith our usual customer's agreement for your signature, and return to us."

The following is such agreement:

MEMORANDUM OF AGREEMENT MADE THIS          DAY OF OCTOBER, 1872.

*Whereas,* I, John Norris, of Buffalo, N. Y., having opened and being in account with Robinson, Chase & Co., bankers and brokers, in the city of New York: Now, in consideration thereof, and for value received, I, John Norris, have agreed, and do hereby agree with the said Robinson, Chase & Co., that in case they shall advance any sum or sums of money, from time to time, in and for payment of any stocks,

securities or gold, purchased by them upon my order, and for my account, or for payment of checks or drafts made or drawn by me, or for loans or payments to me, or for my account or use, or in case I shall become indebted to Robinson, Chase & Co. for any deficiency arising out of contracts or transactions in or relating to stocks, securities or gold, then and in either event the said Robinson, Chase & Co. may sell, and I hereby authorize and empower them to sell, in their discretion, at any of the brokers' boards, long room or elsewhere, or at public auction or private sale, with or without advertising the same, and without prior demand of any kind upon or notice to me of the time and place of sale, all or any gold, stocks, property, things in action or collateral securities held by them and belonging to me, or in which I may be interested. And I authorize and empower the said Robinson, Chase & Co. to apply the proceeds of any such sales toward repayment of such advances or indebtedness, and the interest thereon, and commission and expense of sale or negotiations, holding myself responsible and liable for payment of any deficiency existing after such application. And I further authorize and empower the said Robinson, Chase & Co. to hypothecate, pledge or use in any other manner, all or any gold, stocks, property, things in action, or collateral securities held by them and belonging to me.

And in case of short sales, or time contracts made on my behalf for the future sale or delivery of stocks, securities or gold, they may protect themselves by prompt purchase at such places, on such terms and at such times as they may deem expedient and proper, and without prior call or demand on or notice to me of any kind, holding myself liable in like manner for any deficiency arising on such purchase or purchases, intending hereby to give them entire discretion to act in the premises as they may deem expedient for my interest, or to protect their own.

(Signed)      JOHN NORRIS.

The defendant immediately signed this agreement and returned it by mail to the plaintiffs.

On the 19th of October, 1872, the plaintiffs purchased for the defendants $5,000 more of South Carolina bonds, and on the eleventh day of November rendered an account showing that the defendant was indebted to them in the sum of $1,643.35 over and above all remittances received by them. On the eighteenth of November the plaintiffs received from the defendant a letter enclosing a draft for $821.68, one-half of the balance due on the purchase of the $10,000 of the South Carolina bonds, and informing them that Mr. John Douglas, who was a customer of the plaintiffs, owned one-half of these bonds, and would remit the other half of the purchase-money, viz: $821.68, which he did. Since November 11, 1872, interest to the amount of $2.22 had accrued, and this was paid subsequent to the 18th day of November, 1872.

On the twentieth of November the defendant remitted to the plaintiffs $1,000, and in the letter accompanying the same used the following language : " Inclosed please find draft for $1,000 which you will please place to my credit and allow me the same interest as you do Mr. John Douglas of this city." The plaintiffs acknowledged the receipt of the remittance of $1,000, by a letter dated the twenty-first of November, in which they say : " Your account will bear interest on same terms as that of your friend Mr. Douglas, viz., six per cent if merely used for banking purposes and seven per cent if for dealing in stocks."

From this time to January 1st, 1873, the defendant bought and sold certain stocks through the plaintiffs, and on the 8th day of January, 1873, they rendered an account to the defendant showing a debit balance of $5,862.99. Among the charges in this account was an item of $61.72. " Your proportion expenses incurred by us during stringencies on stocks carried for your account ;" and in a day or two thereafter the defendant sent to the plaintiffs an acknowledgment in writing, of the correctness of this account.

Robinson agt. Norris.

The dealing continued between the parties from January 1st, 1873, to July 1st, 1873, when, on the twelfth of that month, an account was rendered to defendant showing a debit balance of $33,798.97, and with the account was inclosed a request to sign a memorandum of the correctness of the account. During the months of February, March and April almost daily charges were made against the defendant for commissions, being his proportion of the commissions paid by the plaintiffs for borrowing money to carry the stocks of their customers during monetary stringency when money could not be procured at seven per cent. These charges were made at the end of the business of each day and the defendant was immediately informed in every instance of the charge having been made, in a letter in the following form :

" We charge your account for commissions paid by us in borrowing money on fifteenth instant, $1.36, being 1-50 per cent on your debit balance, $6,800."

The defendant received these notices by due course of mail, and never made any objection whatever to the same, or to the plaintiffs procuring the money for the purpose of carrying his stocks by paying commissions in addition to seven per cent interest. The defendant did not sign the admission of the correctness of the account sent to him July twelfth, but called on the plaintiffs at their banking-house in this city, in the month of August and made, as he alleges, some complaints about these charges for commissions. About the eighteenth of September, a monetary panic then prevailing in the city of New York, the plaintiffs telegraphed to Burt & Co., requesting them to ask the defendant to send them more money as a margin, and on the same or the next day they received by telegraph an order from the defendant to sell 300 shares of New York Central, which they did on the nineteenth of September. On the twentieth of September the stock board closed. On the twenty-fourth of September, stocks having still further declined, the plaintiffs telegraphed to the defendant to remit $1,500, and on the same day the

defendant answered them by telegraph that he could not raise the currency, and on the same day, stocks having declined still further, the plaintiffs sold in Broad street, that being the only place where stocks could then be sold, the Stock Exchange being closed, without any notice to the defendant, 200 shares of Lake Shore stock which they had been carrying for him. That upon being informed of the said sale the defendant denied the right of the plaintiffs to sell this stock. That after crediting the defendant with the proceeds of the sale of Lake Shore stock, he was indebted to the plaintiffs in the sum of $1,523.92 as security for which they held $5,000 in South Carolina bonds, which then had no market value, and the right to collect $1,200, on the fifteenth of October, the amount of dividends which had been declared upon the 300 shares of New York Central stock, previously sold by the plaintiffs for the account of the defendant. This $1,200 was collected on the twelfth of October, leaving $323.92 and interest due to the plaintiffs, as they claimed, as collateral for which they hold the $5,000, Carolina bonds.

This action is brought to obtain a decree of this court directing the sale of said bonds, or so much thereof as may be necessary to pay said balance. The defendant claims that the sale of said Lake Shore stock was without his authority, and that the plaintiffs by the sale which they made converted the same to their own use, and also that they have no right to make the charges for commissions paid for borrowing money.

*John E. Burrill*, for plaintiffs.

*Mr. Sackett*, and *Mr. Norris* in person, for defendant.

VAN BRUNT, *J.*— There is no dispute about the facts of this case and the questions which I am called upon to decide are merely those of law. The first question which presents itself is as to the right of the plaintiffs to charge the commissions which they did in the account of the defendant for obtaining money.

Robinson agt. Norris.

At the commencement of their dealings, in a letter of the 10th of October, 1872, the plaintiffs informed the defendant that their custom was in case of a stringent money market to charge such commissions as they were required to pay in raising money, and in the case of the first account rendered, and which the defendant acknowledged to be correct, there was a charge for money paid out in this way, and it is to be noticed that the defendant was duly informed every day when any such charge was made against him, and he made no objection to the same until August at least, although they were made in February, March and April. It seems to me very clear that the defendant was in duty bound, if he intended to dispute these charges, to notify the plaintiffs at once as soon as he was made aware of the fact, and not let them make day by day these expenditures for his benefit, and not wait until he is called upon to pay to dispute them. If he did not desire them to raise money to carry his stocks at such high rates, he should have said so, and then the plaintiffs could have protected themselves.

The defendant, in his points, urges that the plaintiffs were merely his agents to borrow the money, and that he owed the lenders of the money, and not the plaintiffs. This position is entirely untenable, because no rule is better established than that if an agent pays out money for his principal that he may sue and recover the sum so paid from the principal. Mr. Atkins swears that they actually paid these sums for commissions to obtain money to carry the defendant's stocks, and hence if done by his authority, and we must assume that it was so done, in view of the letter of October tenth and the daily notification of such expenditures without any objection being made by defendant, they have a clear right to claim their payment of the defendant.

The next question is as to the sale of the Lake Shore stock. If the agreement of October eighteenth was still in force, there can be no question upon the subject, as it gives the plaintiffs the right to sell, whenever and wherever they

Robinson agt. Norris.

please. The defendant claims that this agreement applies only to the purchase of bonds, which account was closed on or about the 18th of November, 1872, and did not cover subsequent transactions. In discussing this question it will be necessary to consider, briefly, the circumstances under which the agreement of October eighteenth was signed. Upon the receipt of the first order from the defendant the plaintiffs at once inclose to him this agreement for signature, saying: " We herewith inclose our usual customer's agreement for your signature," and he signs and returns the same to them. It has been settled by our court of appeals, that no custom among brokers can deprive parties of rights which the law gives them, but they have not decided that those rights may not be waived by agreement.

I think it perfectly clear that if the broker informs his customer of the terms upon which he will act for him as his broker, and in view of that notice the customer gives an order, he is bound by the terms on which the broker proposed to act for him.

So in this case, if the plaintiffs had written to the defendant that the terms upon which they accepted orders from customers were as stated in the printed contract and he had then given an order, he would have been bound by its terms even though he had never signed it, or given any express assent to it. As well might a customer of a merchant say, after buying goods, that he had not promised to pay cash, because he said nothing when the merchant, before dealing with him, had told him he only sold for cash.

It seems to me immaterial, therefore, whether the agreement, as signed, was intended to apply to any other transactions than the bonds or not; it was a notice to him of the terms upon which the plaintiffs would deal with him, and when he gave his orders he assented to its conditions.

But I do not think that there is any thing in this case to show that it was only intended to apply to the purchase of the bonds.

The defendant became a customer of the plaintiffs for the first time when he gave the first order, he signs what the plaintiffs notify him is their "usual customer's agreement," and he goes on dealing with them almost continuously thereafter. The mere fact that for one day or two the account was balanced does not alter the question, because the defendant still continued to be the plaintiffs' customer — there had never been a sufficiently long cessation of dealings for him to lose that relation. In fact there was no formal closing of the account, and the defendant never, by any act of his, showed that he intended to close his account. The mere payment of all the money which he owed upon the bonds did not show any such intention, because if he had intended so to do he would have taken up his bonds and not have allowed them to remain in plaintiffs' hands and be used at a margin for his future purchases. The fact that the stock was not sold at the Stock Exchange does not invalidate the sale, because the contract gives them the right to sell wherever they please; neither were the plaintiffs bound to sell as soon as margin was exhausted, as long as they acted in good faith.

The plaintiffs must have judgment, with costs.